FILED
2011 Apr-27  AM 10:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **HARRIET RICHARDSON**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action Number |
| | ) | **2:09-cv-1902-AKK** |
| **RITE AID CORPORATION, et al.,** | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Before the court is Harco, Inc.'s[1] Motion for Summary Judgment.  Doc. 43.

Plaintiff responded, (doc. 48), Defendant replied, (doc. 50), and the motion is ripe

for adjudication.  In a nutshell, Plaintiff's entire discrimination case is based on

her contention that her supervisor fabricated or encouraged customer complaints

against her – the reason Defendant discharged her – to retaliate against her for

uncovering and/or to prevent her from uncovering his misappropriation of

controlled prescription drugs.  Even if Plaintiff is correct, by her own contentions,

the supervisor's need for self-preservation, rather than race or gender animus, is

---

[1]Harco, Inc. asserts that, at all times relevant, Plaintiff worked solely for Harco, Inc., not Rite Aid Corporation.  The distinction is irrelevant for purposes of the court's analysis here.  As a result, the court will refer to Harco, Rite Aid, and Defendant interchangeably.

1

why she lost her job.  While the supervisor's actions may be unjust or unfair,

"[t]he question to be resolved is not the wisdom or accuracy of [the employer's]

conclusion . . . or whether the decision to fire her was prudent or fair.  Instead, our

soul concern is whether unlawful discriminatory animus motivated the decision."

*Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010)

(internal quotation and citation omitted).  Stated differently, "Title VII [and

Section 1981] address[] *discrimination*.  Title VII [and Section 1981] . . . [are] not

a shield against harsh treatment in the workplace."  *Nix v. WLCY Radio/Rahall

Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) (emphasis in original) (internal

quotation and citation omitted).  On this record, Plaintiff has failed to establish

that unlawful discriminatory animus motivated her discharge.  Therefore, for the

reasons stated more fully below, the court **GRANTS** Defendant's motion.

## I. STANDARD OF REVIEW

Under Rule 56(c)(2) of the Federal Rules of Civil Procedure, summary

judgment is proper "if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."  "Rule 56(c)

mandates the entry of summary judgment, after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing

*Anderson*, 477 U.S. at 252)).

## II.  FACTS

Plaintiff is an African-American female who worked for Harco, a subsidiary of Rite-Aid.  Church Decl. ¶9 (doc. 42-2); Richardson Dep. at 276 (doc. 42-3).  In December 2006, Rite-Aid's Pharmacy District Manager ("PDM"), Jeffrey Church ("Church"), hired Plaintiff as a full-time "floater" pharmacist, which required her to work at up to twenty different locations.  Church Decl. ¶¶9-10; Richardson Dep. at 36-37, 40.  According to Rite-Aid's description, "[t]he primary purpose of [the pharmacist] position is to assist customers with their health care needs by filling prescriptions and providing excellent customer service and assisting with supervising Pharmacy associates."  Doc. 42-8.  As a floater pharmacist, Plaintiff reported directly to Church.  Richardson Dep. at 40.  From February 1, 2007 until April 30, 2007, Church issued her at least 5 written disciplinary notices for being rude and discourteous to customers and co-workers, for failing to attend to doctor calls, and for lack of professional conduct.  Church Decl. ¶18; docs. 42-58; 42-59; 42-60; 42-61; 42-62.  Thereafter, on June 1, 2007, Church issued Plaintiff a "final warning" for continuing discourtesy to customers and coworkers and for general lack of professional conduct.  Church Decl. ¶18; doc. 42-63.  This "final warning" indicated that subsequent infractions could result in termination.  Doc. 42-63 at 3.

4

In November 2007, Plaintiff asked Church to promote her to staff pharmacist to ensure a more regular schedule and an assignment to a single store. Church Decl. ¶11; Richardson Dep. at 38-39, 136, 220.  Despite the customer complaints and the "final warning," Church agreed and promoted Plaintiff to staff pharmacist at the Center Point location on November 25, 2007.  Richardson Dep. at 39-41.  Joseph Kelly was the Pharmacy Manager of that store, Church Decl. ¶11; Richardson Dep. at 44, and had some supervisory authority over Plaintiff, including reviewing her on Rite Aid's "Field Performance Management Salary Appraisal Form."  Church Decl. ¶11; Doc. 48-15.  Kelly had some of the same responsibilities as Plaintiff – they both filled prescriptions, had alternating schedules as partner pharmacists, oversaw the pharmacy technicians, and answered to the same PDM, Church, who oversaw the district encompassing the Center Point store.  Church Decl. ¶¶6, 11; Richardson Dep. at 44-45, 70.  Plaintiff also filled in for Kelly on occasion.  Church Decl. ¶13.  However, as Pharmacy Manager, Kelly also had managerial responsibilities that Plaintiff did not, such as managing the human resources and financials of the store, scheduling the work hours of store personnel, and managing loss prevention.  Church Decl. ¶11.  The Pharmacy Manager is also responsible for handling customer complaints in ways that a staff pharmacist is not.  Richardson Dep. at 71-72, 76-77.

5

On February 21, 2008, less than three months after Plaintiff's assignment to the Center Point store, Kelly conducted Plaintiff's annual Salary Appraisal Performance Review and rated her as follows: "Above Expectations" on Customer Focus, "Outstanding" on Teamwork, and "Above Expectations" for the Overall Performance Rating.  Doc. 48-15.  A few weeks later, on March 10, 2008, Church reviewed Kelly, and rated Kelly's Customer Focus as "Needs Development," his Teamwork as "Competent," and his Overall Performance Rating as "Competent." Doc. 48-12.  Plaintiff contends that she is a better employee than Kelly since Kelly received a lesser rating from Church than the one Kelly gave Plaintiff.  Doc. 48 at 12,14-15.

One of Plaintiff's duties as a staff pharmacist was to track the dispensing of Schedule II controlled substances ("CII drugs") and to take inventory of the CII drugs at the beginning of each month.  Richardson Dep. at 164-66.  Often, if she found discrepancies, Plaintiff attempted to resolve them herself.  *Id.* at 169-70. However, Plaintiff recalls at least three specific discrepancies in the CII drug inventory, in July or August 2008, November 2008, and December 2008, that she reported to Kelly and Church by phone and by Rite-Aid e-mail because she could not resolve them on her own.  *Id.* at 171-73.  In each case, Kelly informed Plaintiff when he resolved the discrepancy.  *Id.* at 173-74.  Plaintiff never questioned the

resolution or followed up with Church after hearing from Kelly.  *Id.* at 174-175.

For the first seven months she was a Staff Pharmacist, Plaintiff apparently did not receive any written notices of customer complaints.  But on June 26, 2008, Church issued Plaintiff another "final warning" based upon complaints by a nurse regarding Plaintiff's treatment of her and by a customer who claimed that Plaintiff closed the pharmacy's drive-thru early.  Doc. 42-64.  Church's written notice to Plaintiff reminded her that the conduct was an ongoing problem and urged her to change how she treated customers, doctors, and nurses, even if it did not come natural: "I need you to work hard on this.  We have had this discussion before.  This is affecting sales and scripts in the store.  You need to do whatever possible to please our customers."  *Id.*  On August 6, 2008, Plaintiff received another "final warning" from Church for her unprofessional treatment of a doctor, who claimed that Plaintiff hung up on him when he attempted to call in a prescription.  Doc. 42-65.  This time, Church handwrote the following: "Final Warning.  Termination will follow any further customer/Dr. complaints or failure to perform to Rite Aid standards or pharmacy operations."  *Id.*  Plaintiff, however, asserted that the August 6 disciplinary notice was "wrong and inaccurate."  Richardson Dep. at 222-23, 226-28.

Thereafter, on December 19, 2008, after receiving two more customer

7

complaints, Church terminated Plaintiff, citing "customer service issues."  Doc.
42-66.  Church confirms that he decided to discharge Plaintiff based upon the
numerous complaints he received and the behavior he witnessed.  Church Decl.
¶18.  Church claims he had no reason to doubt the validity of the complaints and
that Plaintiff never informed him that she had suspicions about the accuracy of the
complaints.  *Id.*  Apparently, it seems Plaintiff believes that Kelly encouraged at
least one of her last customer complaints, though she admits she never mentioned
her belief to Church.  Richardson Dep. at 199, 256-57.  She also believes Church
treated her unprofessionally in handling the customer complaints and her
termination.  *Id.* at 203-06, 240.  However, Plaintiff admits she has no knowledge
whether Church reviewed or how he reviewed customer complaints with other
pharmacists, either male or non-African-American.  *Id.* at 186-88.

In September 2009, more than nine months after terminating Plaintiff,
Defendant discharged Kelly when he admitted that he filled prescriptions routinely
for uninsured family members even though no doctor actually prescribed them.
Doc. 42-72; doc. 48-4.  Plaintiff believes that Kelly's September 2009 admission
of improperly filling prescriptions for relatives explains the December 7, 2008 CII
drug inventory discrepancy she reported.  Moreover, she claims that her report led
to her termination on December 19, 2008, because Kelly must have taken the

missing medications and, presumably, masterminded her discharge to cover his

tracks.  *See* Richardson Dep. at 235-40,

## III.  ANALYSIS

Plaintiff's Amended Complaint asserts a violation of the Fair Labor

Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, for an alleged failure

to pay overtime compensation and a violation of 42 U.S.C. § 1981 for sex and race

discrimination.  Doc. 21.  However, Plaintiff concedes her FLSA claim.  Doc. 48

at 4.  Therefore, summary judgment is due on the FLSA claim.  As to her other

claims, because Plaintiff addresses only her race discrimination claim in her

opposition to summary judgment, the court assumes she abandons and concedes

her gender discrimination claim as well.[2]  *See Robinson v. Regions Fin. Corp.*, 242

F. Supp. 2d 1070, 1075 (M.D. Ala. 2003) (deeming abandoned the plaintiff's

claims that she failed to address in her opposition to summary judgment).

Accordingly, the court addresses only Plaintiff's claim for racial discrimination.

### A.  Section 1981 Race Discrimination Generally

Where, as here, a plaintiff asserts race discrimination based upon

---

[2]Moreover, "[i]t is settled that Section 1981 does not prohibit discrimination on the basis of gender."  *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998) (citing *Runyon v. McCrary*, 427 U.S. 160, 167 (1976)); *see also Givens v. Chambers*, 548 F. Supp. 2d 1259, 1269 (M.D. Ala. 2008) (Section 1981 provides a remedy only for racial discrimination).  Alternatively, the gender discrimination claim fails for the same reasons as the race claim – Plaintiff cannot establish a prima facie case and cannot rebut Defendant's articulated reasons for her discharge.

circumstantial evidence, the court applies the well-established burden-shifting

framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  "To

establish a prima facie case of disparate treatment, [the plaintiff] must show that

(1) she is a member of a protected class; (2) she was subjected to adverse

employment action; (3) her employer treated similarly situated white employees

more favorably; and (4) she was qualified to do the job."  *McCann v. Tillman*, 526

F.3d 1370, 1373 (11th Cir. 2008) (internal quotation marks and citation omitted).

If the plaintiff satisfies those elements, then the defendant must provide a

legitimate, non-discriminatory reason for its action.  *Id.* (citation omitted).  If the

defendant meets its burden, then the burden shifts back to the plaintiff to prove

that the defendant's reasons are pretext for the unlawful discrimination.  *Id.*

(citation omitted).  At all times, "the plaintiff retains the ultimate burden of

proving by a preponderance of the evidence the existence of purposeful

discrimination."  *Crawford v. Chao*, 158 F. App'x 216, 218 (11th Cir. 2005)

(internal quotation marks and citation omitted).

## B.  Plaintiff's Race Discrimination Claim

Defendant attacks Plaintiff's claim two ways – first it contends that Plaintiff

cannot make a prima facie case because she cannot identify a similarly situated

comparator Defendant purportedly treated more favorably, and, second,

alternatively, that summary judgment is warranted because Plaintiff failed to rebut its legitimate, non-discriminatory reasons for her termination.  Doc. 42 at 34.  The court addresses Defendant's arguments in turn.

(i)     Plaintiff cannot make a prima facie case because she cannot show that Defendant treated a similarly situated employee more favorably.

In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.  *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  "To meet the comparability requirement a plaintiff is required to show that he is similarly situated in all relevant aspects to the non-minority employee." *Crawford*, 158 F. App'x at 218.  As it relates to discipline, "[t]he most important variables . . . and the most likely sources of different but nondiscriminatory treatment, are the nature of the offenses and the nature of the punishments imposed."  *Crawford*, 158 F. App'x at 218 (citation omitted).  "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present."  *Holifield*, 115 F.3d at 1562.

Plaintiff disagrees with Defendant's contention that she cannot identify a

similarly situated comparator, and asserts that "similarly situated Caucasian pharmacist (Joe Kelly) was treated more favorably, in regard to comparing customer complaints." Doc. 48 at 11. However, Plaintiff is not "similarly situated in all relevant respects" or "nearly identical" to Kelly for Title VII and Section 1981 purposes. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004). Specifically, first, Kelly and Plaintiff had different positions and responsibilities. Although "differences in job ranks between a plaintiff and another employee are not, in and of themselves, dispositive," job rank and responsibilities are factors the court must consider. *See Rioux v. City of Atlanta*, 520 F.3d 1269, 1281 (11th Cir. 2008). Here, while both Kelly and Plaintiff filled prescriptions and worked as pharmacists, they differed in one significant manner – Kelly had supervisory responsibility over Plaintiff. Among other things, he conducted Plaintiff's reviews, participated in her salary appraisal, and had authority to reprimand her. *See* docs. 48-15; 48-17; Church Decl. ¶¶6, 11. Kelly also had additional managerial responsibilities, including creating work schedules and overseeing the budget, which Plaintiff did not have. *See* Church Decl. ¶¶6, 11. In short, Plaintiff is not similarly situated to her supervisor. *See, e.g., Coar v. Pemco Aeroplex, Inc.*, 372 F. App'x 1, 3-4 (11th Cir. 2010) (hourly employee plaintiff cannot rely on supervisors as comparators since supervisors have

different work rules); *Smith v. Sunbelt Rentals, Inc.*, 356 F. App'x 272, 279 (11th

Cir. 2009) (rejecting the plaintiff's comparators because "[in] addition to the

differences in conduct," the comparators "held a different rank and had different

job responsibilities."); *see also* docs. 48-15;48-17.

     Second, that Plaintiff cannot rely on her supervisor as a comparator is

further underscored by the fact that she is relying on an excellent review her

supervisor gave her to contend that she is a better employee than that supervisor.

*See* doc. 48 at 12.  In particular, she compares the favorable review Kelly gave her

to a mediocre review Kelly received from his supervisor.  Plaintiff's comparison is

misplaced because, although Kelly and Plaintiff shared Church as their PDM,

Kelly reviewed Plaintiff while Church reviewed Kelly.  Docs. 48-15; 48-12.

Though the existence of different supervisors *alone* does not invalidate a

comparator, "[d]ifferent supervisors may have different styles that – while not

determinative – could account for the disparate treatment that employees

experience."  *See Anderson v. WBMG-42, Parker Commc'ns Inc.*, 253 F.3d 561,

566 (11th Cir. 2001) (internal quotation marks and citation omitted).  Such a

comparison seems even more inappropriate where, as here, the Plaintiff's

supervisor is the purported comparator.  Indeed, the court is confident Kelly would

have probably rated himself as high or higher than he rated Plaintiff if he also

conducted his own review.  Likewise, if Church conducted Plaintiff's review, there is no guarantee Plaintiff would have received the same high rating Kelly gave her or that Church would have rated her higher than he rated Kelly.  *See, e.g.*, *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1261 n.5 (11th Cir. 2001) ("[D]ifferences in treatment by different supervisors or decision-makers can seldom be the basis for a viable claim of employment discrimination.").  Unfortunately for Plaintiff, the fact that Kelly performed her salary appraisal only underscores the inappropriateness of Kelly as a comparator here.

Third, even ignoring the inappropriateness of an employee's attempt to compare herself to her supervisor, Plaintiff's claims face another major obstacle – i.e. her customer complaints differ in type, severity, and frequency from Kelly's.  "The standard for similar conduct is a fairly rigorous one."  *Rioux*, 520 F.3d at 1281.  "The comparator's misconduct must be nearly identical to the plaintiff's in order to prevent courts from second-guessing employers' reasonable decision and confusing apples with oranges."  *Id.* (internal citation and quotation marks omitted).  Here, Plaintiff has no evidence of any contemporaneous customer complaints regarding Kelly– in fact, the Kelly customer complaints Plaintiff references date back to 2000, i.e. six years before Plaintiff worked at Rite Aid.  *See* doc. 48 at 5-6.  In contrast, Plaintiff acknowledged at least 10 different

14

complaints she received during 2007 and 2008, though she contends many were inaccurate. *See* Richardson Dep. at 222-28. Moreover, the complaints against Kelly of mis-filled prescriptions occurred in 2000, when he reported to a different PDM. *See* doc. 48-13. Since that PDM played no role in any decisions concerning Plaintiff, Plaintiff cannot rely on his actions related to Kelly to support her claim of alleged disparate treatment. *See, e.g.*, *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) ("Courts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII [and Section 1981] analysis.") (citations omitted).

Fourth, that Defendant failed to discharge Kelly for the complaints he received in 2000 does not establish that Defendant treated him more favorably than Plaintiff. As Plaintiff's own history shows, Defendant does not automatically discharge employees when they receive a complaint. Rather, Defendant issues warnings and provides the employee an opportunity– or in Plaintiff's case, multiple opportunities – to improve. Absent a showing that Defendant provided Kelly more opportunities to improve than it did Plaintiff, Plaintiff's reliance on complaints Kelly received to show disparate treatment misses the mark. In short, Plaintiff presents no evidence that Kelly received the same type or anywhere near the same volume of complaints as her. *See* Church Decl. ¶19. Therefore, Plaintiff

15

has failed to establish that Kelly is a proper comparator.

Finally, Defendant ultimately terminated Kelly for falsifying prescriptions for his family members, a reason completely distinct from the customer service issues Church cited in Plaintiff's termination. *See* doc. 42-72. Defendant discovered the false prescriptions in September 2009, nine months after Plaintiff's discharge, and promptly terminated Kelly. Docs. 42-72; 48-2; 48-4. While Plaintiff asserts that such violations of Rite Aid policy and federal law are far more serious than her own customer service issues, *see* doc. 48 at 11-12, this, again, underscores the inappropiateness of Kelly as a comparator. They did not engage in the same conduct and, significantly, Defendant terminated both. The court therefore does not see why Kelly's allegedly "more serious" infractions helps Plaintiff since this court is precluded from acting as a super personnel board that dictates that Defendant had no right to discharge Plaintiff for her allegedly minor infractions – which it seems is what Plaintiff is suggesting in light of her deposition testimony. *See Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*) ("[F]ederal courts do not sit as a super-personnel department that re-examines an entity's business decisions.") (citation omitted). Moreover, Defendant discovered Kelly's falsification of prescriptions in late 2009, more than nine months after Plaintiff's termination. *See* 42-72; 48-2; 48-4. In other words,

even if Plaintiff is correct that Kelly committed a far more serious infraction, Defendant terminated Kelly also, making Plaintiff's assertion that Kelly was treated *more favorably* all the more inapt.

Where, as here, Plaintiff's sole comparator held a different position with additional responsibilities, did not share the same performance reviewer, received fewer customer complaints, and ultimately suffered the same adverse employment action, Plaintiff's prima facie case fails and summary judgment is proper.

(ii)   Plaintiff failed to rebut defendant's legitimate, non-discriminatory reason for her termination.

Alternatively, Plaintiff's claim fails also because she cannot show that Defendant's reasons for her termination, i.e. numerous customer complaints, are pretextual.  "To survive summary judgment, the plaintiff must then present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext.  Mere conclusory allegations and assertions will not suffice."  *Crawford*, 158 F. App'x at 219 (citation and internal quotation marks omitted).  A plaintiff "may demonstrate pretext 'by revealing such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [the employer's] proffered legitimate reasons for its actions that a reasonable fact finder could find them unworthy of credence.'"  *Adams v. Fulton Cnty., Ga.*, 397

17

F. App'x 611, 612 (11th Cir. 2010) (quoting *Springer v. Converges Customer*

*Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007)).

Significantly, "[a] plaintiff is not allowed to recast an employer's proffered

nondiscriminatory reasons or substitute his business judgment for that of the

employer.  Provided that the proffered reason is one that might motivate a

reasonable employer, an employee must meet that reason head on and rebut it, and

the employee cannot succeed by simply quarreling with the wisdom of that

reason." *Chapman*, 229 F.3d at 1030.  Thus, "[c]onclusory allegations of

discrimination, without more, are not sufficient to raise an inference of pretext or

intentional discrimination where [an employer] has offered . . . extensive evidence

of legitimate, non-discriminatory reasons for its actions." *Id.* (quoting *Young v.*

*Gen. Foods Corp.*, 840 F.2d 825, 830 (11th Cir. 1988)).  A plaintiff's  "subjective

conclusion . . .without supporting evidence, [is] insufficient to establish pretext."

*Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir. 1989).  Moreover, "a reason

cannot be proved to be a pretext for discrimination unless it is shown *both* that the

reason was false, and that discrimination was the real reason." *St. Mary's Ctr. v.*

*Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original) (internal quotation marks

and citation omitted).

Here, Plaintiff seeks to rebut Defendant's articulated reasons by contending

18

that the decision maker, Church, did not rely in good faith on the customer complaints, doc. 48 at 11, and/or that the real reason for her termination was Kelly's desire to cover up the CII drug discrepancies she uncovered by encouraging or soliciting customer complaints against her, doc. 48 at 15. Along these lines, Plaintiff asserts a combination of factors that she believes support her claim and purportedly show that Defendant used the customer complaints as a pretext for discrimination: (1) she received an "Exceeds Expectations" rating for her customer service in early 2008; (2) the complaints dealt with customer service, which is not an essential function of her job; (3) the complaints are inaccurate because she does not remember the underlying incidents or believe they happened; (4) Kelly encouraged customers to complain about her to cover up inventory discrepancies of CII drugs; and (5) Church terminated her based on these complaints either to coverup the missing CII drugs or because of her race. At best, her contentions, which the court addresses in turn, are conclusory in that, despite the multiple customer complaints that suggest otherwise, Plaintiff believes she had excellent customer service skills. However, Plaintiff's personal beliefs about her own abilities are irrelevant:

> [The plaintiff] argues at length that [the defendant's] complaints about
> the quality of her work were unfounded, but the fact that she thinks
> more highly of her performance than her employer does is beside the

point.  The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head.

*Alvarez*, 610 F.3d at 1266 (citation omitted).  As shown below, none of the factors Plaintiff cites establishes pretext.

First, as it relates to the "Exceeds Expectations" rating for customer service, Plaintiff overstates its significance.  Kelly issued this rating in February 2008, three months after Plaintiff came under his supervision.  It is clear that Plaintiff received no customer complaints during this period and, in fact, she received none during the first seven months she worked under Kelly.  However, an "Exceeds Expectations" rating in February 2008 does not rebut the validity of customer complaints she received ***after*** that review, i.e. customer complaints in June that led to the June 26, 2008 "Final Warning" and in July and August 2008 that led to another "Final Warning."  In short, a rating issued at a set date does not guarantee, or prove, that an employee will continue to perform at that level for perpetuity.  To the contrary, as was the case here, employees can, in fact, perform poorly after receiving a favorable rating.

Second, as to Plaintiff's assertion that Defendant purportedly discharged her for a non-essential function, the court notes that Plaintiff's contentions of pretext are tied to her claim that Church must have acted with racial animus because he

discharged her for complaints that dealt with allegedly non-essential functions of a pharmacist (i.e. customer relations), but retained Kelly who mis-filled prescriptions, which is a pharmacist's essential job requirement.  Doc. 48 at 11-12. This argument, however, misses the mark because the Kelly complaints Plaintiff references date back to 2000, i.e. 8 years before her discharge, and, significantly, Church was not Kelly's PDM in 2000.  Thus, any inaction by Defendant regarding Kelly's complaints in 2000 cannot establish pretext when, as here, Church was not even Kelly's supervisor at the time, and thus could not have treated Kelly more favorably than Plaintiff.  *See Gerwens*, 874 F.2d at 1541-42.

Likewise, the evidence belies Plaintiff's contention that she could not have known that complaints regarding her allegedly "non-essential" customer service skills, rather than what she perceived as the essential functions, could result in her termination.  Doc. 48 at 14, 16.  Essentially, Plaintiff claims that "[h]ad the decision maker stated that 'in the event of a customer complaint, within the essential function of her job as a pharmacist, plaintiff would be subject to disciplinary action up to and including termination', [sic] plaintiff's future (December 2008) customer 'complaints' may not have been viewed as pretextual by plaintiff."  Doc. 48 at 14. Consequently, Plaintiff asserts that Church's decision to discharge her is pretextual because he knew that the "complaint involving the

21

doctor was not within the essential function of plaintiff's job." *Id.*  Contrary to her assertions, however, Church warned Plaintiff on multiple occasions that her interaction with customers ***could*** and likely ***would*** lead to her termination.  *See* doc. 42-65 at 2 ("Termination will follow any further customer/Dr. complaints . . .").  Moreover, Church issued Plaintiff three separate "final warnings" and explained that her lack of customer service skills adversely impacted the store's sales and prescription fills.  Doc. 42-64.  While Plaintiff may think the customer complaints were inaccurate, or that customer service was a non-essential task, significantly, Church notified her that continued customer complaints would, in fact, result in her termination.  *See* docs. 42-64 at 2; 42-65 at 2.  Despite the multiple warnings, Plaintiff received additional complaints, which Church had no reason to doubt.  Church Decl. ¶18; doc. 42-66.  In short, the record before the court belies Plaintiff's contention that customer service was a non-essential function of a pharmacist.  To the contrary, it should be axiomatic to anyone working in retail that customer service is an essential job requirement.  *See also* doc. 42-8 (In the job description, Rite-Aid describes the need to "assist customers" and  provide "excellent customer service" as a "primary purpose" for pharmacists).  In any event, the record is clear that Defendant terminated Plaintiff consistent with Church's previous warnings about the need for effective customer service.

Third, as to Plaintiff's contentions about the alleged inaccuracy of the customer complaints, when asked how Church's evaluation were unfair or different than those performed for others, Plaintiff asserted "[i]t wasn't accurate. It wasn't on accurate information." Richardson Dep. at 190.   Again, when asked, "Do you have any reason to believe this written notice [pertaining to customer service issues] was discriminatory in any way, based upon your race or your gender?," Plaintiff replied, "I'm not sure of the accuracy." *Id.* at 224. Unfortunately for Plaintiff, even if the customers "were lying through their teeth," the law is clear that so long as Church believed, in good faith, that the complaints were true, their accuracy is irrelevant. *See Elrod v. Sears, Roebuck & Co.*,939 F. 2d 1466, 1470 (11th Cir. 1991); *see also Gerwens*, 874 F.2d at 1540 ("The law is clear that even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation.").   Significantly, Plaintiff admits she never provided Church with any reason to discredit the complaints except to state her own personal view about their alleged inaccuracy.  Church Decl. ¶18; Richardson Dep. at 199, 222-28; 256-57.  While it is possible that the customers fabricated their complaints, the sheer volume spread over Plaintiff's entire employment with Defendant undermines

23

Plaintiff's contentions.  Specifically, beginning with the first warning on March 26, 2007 and until her December 2008 discharge, Church addressed these issues with Plaintiff, issued her at least 10 written warnings, and told her repeatedly she needed to improve and that her poor customer skills impacted the bottom line adversely.  *See* docs. 42-58 to 42-66.  In short, Plaintiff's long history of customer issues supports Church's contention that he had a reasonable basis to credit the complaints and that he acted in good faith.

Finally, as to Plaintiff's fourth and fifth contentions that Kelly's prescription drug misappropriations caused her discharge, Plaintiff makes clear that the real basis for her discrimination claim is her belief that Church made up several of the customer complaints and that Kelly encouraged customers to complain about her to coverup the December 2008 inventory report that revealed missing CII drugs. *See generally* Richardson Dep. at 194-204.  Indeed, Plaintiff made this contention from the outset of her case, as the Amended Complaint explains: "Plaintiff avers that she was wrongfully terminated because she followed the Code of Federal Regulations and instruction of the Alabama State Board of Health in regard to handling and accounting for scheduled drugs."  Doc. 21 at ¶24.  She underscores this contention in her summary judgment brief:

> When viewed with the proximity to plaintiff's December 18, 2008

> report of CII drugs being dispensed without a prescription number, lost,
> stolen; missing and/or otherwise unaccounted for CII drugs, the alleged
> reason (customer complaints) is pretext.
> . . .
> Again, the decision maker set up a scenario in which any
> subjective customer complaint, whether in the essential function of
> plaintiff's job or not, could result in termination. . . .

Doc. 48 at 15.  Plaintiff argues that because she reported the missing prescription

drugs, Kelly convinced customers to complain about her in an effort to cover up

his conduct.  Unfortunately for Plaintiff, such a conspiracy, while reprehensible,

does not evidence racial or gender discrimination.  Indeed, if anything, it provides

a plausible, non-discriminatory, albeit unfair, motive for Kelly's alleged animus.

However, "Title VII [and Section 1981] address[] *discrimination*.  Title VII [and

Section 1981] . . . [are] not a shield against harsh treatment at the work place."

*Nix*, 738 F.2d at 1187 (emphasis in original) (internal quotation and citation

omitted).  In fact, an "employer may fire an employee for a good reason, a bad

reason, a reason based on erroneous facts, or for no reason at all, as long as its

action is not for a discriminatory reason."  *Id.* at 1184.  In other words, while harsh

and unfair, there is nothing *discriminatory* about a bad actor covering up his tracks

by taking steps to remove all those who may uncover his alleged misconduct.

Likewise, at no point does Plaintiff present any evidence or argument

showing why Church would share Kelly's animus or have a basis to fabricate

complaints against her.  Instead, Plaintiff argues Kelly encouraged the allegedly false complaints and that Church must have known they were false.  Such an unsubstantiated conclusion is insufficient to carry Plaintiff's burden of showing pretext.  Additionally, it overlooks the countless complaints Church received about Plaintiff long before he assigned her to Kelly's store.  Surely, if Church wanted to fabricate complaints against her or discharge her, he would not have given her so many final warnings or promoted her from floater to staff pharmacist. *See, e.g.*, *Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1443 (11th Cir. 1998) (fact that the same decision maker was involved in a positive employment action, i.e. promotion here, and the adverse action "may give rise to a *permissible inference* that no discriminatory animus motivated [the defendant's] actions") (emphasis in original) (citation omitted).

Importantly, the question here is not whether Plaintiff deserved the customer complaints or termination.  Rather, "[t]he question is whether her employers were dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so, or instead merely used those complaints about [Plaintiff] as cover for discriminating against her because of her [race]." *Alvarez*, 610 F.3d at 1266.  The law "does not require the employer's needs and expectations to be objectively reasonable; it simply prohibits the employer from

26

discriminating on the basis of membership in a protected class." *Id.* "Even if [Plaintiff] could show [her performance] was satisfactory by some objective standard, she has not raised a genuine issue of material fact as to the true reason she was fired." *Id.* at 1267. Again, importantly, to survive summary judgment, Plaintiff must "show not just that [Defendant's] reasons for firing her were ill-founded but that unlawful discrimination was the true reason." *Id.*

Here, Plaintiff's vague assertion of a conspiratorial cover up by Kelly, which she fails to impute to Church, and her contention that customer service is not an essential function are insufficient to rebut Defendant's non-discriminatory reasons for her termination. As her deposition testimony indicates, Plaintiff's claim is rooted in her belief that she was a good pharmacist who did her job – certainly more so than Kelly – and not the poor employee that the customer complaints and her eventual termination indicate. However, courts "must be careful not to allow Title VII [or Section 1981] plaintiffs simply to litigate whether they are, in fact, good employees." *Alvarez*, 610 F.3d at 1266 (internal quotation marks and citation omitted). Importantly, nowhere in the evidence or her briefs does Plaintiff assert any reasonable basis to support her claim that Defendant's decision to terminate her was motivated by discriminatory animus. In fact, Plaintiff testified to the contrary:

27

[Defense Counsel] Q: And do you believe that your termination was discriminatory based upon your race and gender?

[Plaintiff] A: Yes.

Q: Why?

A: Because it was lies.  It did not occur.  It was just unfounded.

Q: So it's your belief that because the customer complaint about you which ultimately led to your termination was unfounded that your termination itself was discriminatory based upon your race and gender, is that correct?

A: Yes.

Q: Do you have any evidence to support that?

A: No.

. . .

Q:What about [your write up], though, makes you think it was unfair based upon your race or your gender?

A: I just feel like it was unfair.

Q: It was generally unfair but not necessarily based upon your race or gender?

A: Yes.

Q: I'm correct?

A: Correct.

. . .

Q: Do you believe that this [final warning] was discriminatory based upon your race and your gender?

A: I believe it was wrong and inaccurate.

Q:You believe it was inaccurate?

A: It was wrong.  It did not occur.  It was inaccurate.

Q: Do you believe it was discriminatory?

A: I'm not sure.

Q: You can't say one way or the other?

A: I can't say one way or the other.

. . .

Q: You believe that the reasons for your termination were inaccurate; is that correct?

A: Yes.

Q: Do you believe that your termination was discriminatory?

A. Yes.

Q: Based upon your race and your gender?
A: I'm not sure.
Q: Well, what was it discriminatory based upon?
A: It was wrong.
. . .
Q: . . . Other than your belief that your termination was wrong, do you have any other basis to support your allegation that it was discriminatory based on your race or your gender?
A:  No.

Richardson Dep. at 207-208, 211, 227-28, 230-32.

While Plaintiff may think Kelly masterminded a conspiracy to discharge her, even if true, there is no discrimination because, again, the law is clear that an employer may terminate an employee for even a bad reason, so long as it is not discriminatory.  *See Nix*, 738 F.2d at 1184.  Significantly, this court's "purpose is not to determine whether the employer's decision was prudent or fair, but is to determine whether an unlawful discriminatory animus motivated the employment decision.  Stated differently, pretext is not present unless it is shown both that the reason was false, and that discrimination was the real reason." *Johnson v. Switch Data Mgmt. Co.*, 199 F. App'x 834, 835 (11th Cir. 2006) (internal citations and quotation marks omitted).  The court concludes that Plaintiff has not carried her burden of presenting more than a "mere scintilla of evidence" to defeat summary judgment.  *See Walker*, 911 F.2d at 1577 (citation omitted).  Indeed, Plaintiff seemingly admits, both in her deposition and in her briefing, that her

29

discrimination claim is based upon her assertions that Defendant treated her unfairly or based on an alleged conspiracy between Kelly and Church to cover up the misappropriation of controlled substances.  However, even if the court agreed that a connection exists between the December 7, 2008 CII drug inventory report, Plaintiff's termination, and Kelly's September 2009 admission to improperly filling prescriptions, Plaintiff's discrimination claims still fail because she cannot show that discriminatory animus, rather than some unfair need to hide a drug conspiracy, motivated her discharge.  *See St. Mary's Ctr.*, 509 U.S. at 515.

## IV. CONCLUSION

For the reasons stated more fully above, Plaintiff's claims fail because she cannot establish a prima facie case, or, alternatively, cannot rebut Defendant's articulated reasons for her termination.  Accordingly, the court **GRANTS** Defendant's motion for summary judgment and **DISMISSES** this action with prejudice.

**DONE** this 27th day of April, 2011.

 

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE